STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. LOUIS MUNGIOLI, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 25, 1961—Decided October 16, 1961.

Before Judges GOLDMANN, FOLEY and LEWIS.

*Mr. Benjamin Asbell* argued the cause for appellant.

*Mr. James G. Aiken* argued the cause for respondent (*Mr. Norman Heine,* Camden County Prosecutor, attorney).

The opinion of the court was delivered by

FOLEY, J. A. D.  Defendant and one Myrtle Klein were indicted for knowing and unlawful possession of "divers papers, documents, slips and memoranda pertaining to the business of lottery and lottery policy, so-called, contrary to the provisions of *N. J. S.* 2*A*:121–3(b),  *  *  *." The case was tried in the County Court with a jury.  Both defendants moved for a judgment of acquittal at the conclusion of the State's case; the motion of Myrtle Klein was granted; that of the defendant was denied.  The defense rested without presenting any evidence; the jury returned a verdict of guilty, and defendant appeals.

On April 6, 1960 five members of the police force of the City of Camden, armed with a search warrant, raided an apartment in that city, in the course of a gambling investigation.  The apartment was registered in the name of one DeLuca, and the telephone therein was listed in his name.  Prior to entering the apartment the officers consulted with the superintendent concerning how they could effect entry without damage to the building.  While they were waiting for the superintendent in his office, Myrtle Klein entered to report difficulty she was having with a wash tub.  About

45 minutes later they entered the apartment. Defendant, who opened the door for them, was the sole occupant. Their search consumed approximately two hours during which time Myrtle Klein came in. The only evidence seized by the police was a slip of paper which was marked Exhibit S–1 at the trial, and a pad of which it was the top sheet. These were found on a telephone table near the front door. The exhibit bore some figures beneath letters, all written by pencil. The police were frank to say at the trial that these pencilled notations were "unconnected" with a lottery operation. One of the sets of letters at the top of S–1 was "Al," and it was testified that the defendant was known by the alias "Al Martin." One of the officers, Lieutenant Saunders, when asked, "Is there anything on that paper that connects it with Mr. Mungioli at all, or the defendant, Miss Klein?" answered, "it was in their place of residence near the telephone."

Close examination of the paper disclosed that it bore a number of indentations. Application of graphite powder to the sheet revealed that the indentations corresponded with a typical recordation of lottery or "numbers" play. Myrtle Klein and defendant were arrested and gave statements to the police, the contents of which do not appear in the record. In the course of interrogation defendant told Lieutenant Saunders, one of the arresting officers, that he paid the telephone bill.

Defendant assigns as error that: (1) S–1 was inadmissible because (a) there was no proof to connect it with the defendant, and (b) it was not a paper, document, slip or memorandum that pertained in any way to the business of lottery or lottery policy, so-called, within the meaning of *N. J. S.* 2A:121–3(b); (2) the evidence was insufficient to enable a jury to find that defendant knowingly possessed the slip of paper in question; and (3) the court's charge with respect to "constructive possession" was inadequate.

Initially, we are concerned with the admissibility of S–1 since it was indispensable to the State's case. The crucial

evidence on which the exhibit was admitted was furnished by Lieutenant Saunders, in his capacity as an expert in knowledge of gambling paraphernalia. On direct examination the witness testified that lottery bets are *normally* recorded on a piece of paper and that the numerals placed thereon "can be put down with a pencil, pen, or they can even be put down with a ball point pen where you don't push the pen out." Later, when referring specifically to S–1, he testified:

"Q. There was no pen writing on there, was there?
A. There could have been.
Q. Did you see any?
A. There *could have been* with a ball point pen that wasn't put in the writing position.
Q. Do you see any ball point pen on that piece of paper?
A. I say that these marks *possibly* could have been made by that—"

Laying aside the effect of a mere "possibility," if the indentations were the result of the *direct* application of the retractable ball point to S–1, it could be inferred that this method of recording was used as a subterfuge to camouflage the unlawful act, much in the same way as the use of invisible ink would serve such purpose. In such circumstances, we would have no doubt that S–1 would be a "paper" contemplated by the statute.

However, on cross-examination when the officer was questioned as to the origin of the indentations on S–1 he testified as follows:

"Q. Now, where these indentations came from, do you know?
A. *From the sheet that was on top of it, the original sheet.*
Q. Could it have been three or four sheets on top of it?
A. It depends on how much pressure was applied when the writing took place.
Q. In other words, it could have been when there was enough pressure applied three or four sheets on top?
A. Could have been.
Q. And it could have been the sheet immediately on top of it, that right?
A. Yes, sir." (Emphasis added)

The clear import of Saunders' testimony was that Exhibit S-1 is a *reproduction* of "a paper, document, slip or memorandum" pertaining to "the business of lottery," *accidentally* made. Thus, it was not designed to serve, nor did it in fact serve, in any way the purposes of a lottery business. In that respect it is clearly distinguishable from a carbon copy of proscribed lottery recordations. The latter would be tainted by illegality, since the very fact that duplicates are intentionally made and retained, would permit of the inference that they are in some way designed to serve the business of a lottery.

The broad language of the Legislature interdicting possession of a paper, document, slip or memorandum pertaining to a lottery business, plainly indicates an intent to embrace the knowing possession of material which in any way contributes to the crime of operating a lottery. But the boundaries fixed by the language "pertaining to the business of a lottery" are not limitless. "Any way" presumes "some way," and that way must pertain to the purported subsistence of a lottery business. For example, if there were found in one's knowing possession a paper on which there was noted merely the address of a known lottery business, in a broad sense the paper would "pertain" to a lottery business. Yet, one could scarcely conclude that possession of such a paper violated the statute, for the reason that no inference could be drawn from it that it was in any way associated with the *conduct* of the *business* of a lottery.

We are of the opinion that Exhibit S-1 was not, in and of itself, a paper which served any utilitarian purpose in a lottery business, or what purported to be a lottery business. Compare *State v. Arthur,* 70 *N. J. L.* 425 (*Sup. Ct.* 1904). On the contrary, it was simply secondary evidence that at some prior time a lottery slip had been written on the pad of which it was a part. This was not enough to render it admissible. As a foundation for admission of the exhibit as secondary evidence it was prerequisite that some proof, direct or circumstantial, be offered to estab-

lish knowing possession by the defendant of the original paper on which the wagers were recorded. There was, of course, no such evidence. It follows that the admission of the exhibit requires reversal.

But even if exhibit S–1 were properly received in evidence, we are satisfied that the proofs submitted by the State were not susceptible of an inference that constructively, defendant was in knowing possession of it. The necessary elements of the unlawful possession of material of the character here involved were delineated in *State v. Labato*, 7 *N. J.* 137, 148 (1951), where the court said:

" 'Possession' is an ambiguous term derived from the Roman law. It has variant connotations; but on well-settled principle the word is to be given a strict construction in statutes defining criminal and penal offenses. It signifies an intentional control and dominion. *Bergedorff v. United States*, 10 *Cir.*, 37 *Fed.* (2d) 248 (1929). *Animus possidendi* is of the essence of possession. Such was its primary meaning under Roman law. 'Possession is the occupation of anything with the intention of exercising the rights of ownership in respect to it.' *Hunter, Rom. Law* 209. Under the cited statutes, 'possession' imports 'corporeal possession in fact. * * * The elements of this possession are: First, the mental attitude of the claimant, the intent to possess, to appropriate to oneself; and, second, the effective realization of this attitude. Effective realization involves the relation of the claimant to other persons, amounting to a security for their noninterference, and the relation of the claimant to the material thing itself, amounting to a security for exclusive use at will. All the authorities agree that an intent to exclude others must coexist with the external facts, and must be fulfilled in the external physical facts, in order to constitute possession. It is this requirement which prevents the man in whose building, or automobile, or traveling bag, or pocket, liquor is found, which was surreptitiously placed there by another, from being a violator of the law.' "

It is, of course, settled that on a motion for an acquittal the test is "whether there is any legal evidence before the jury, viewing the proofs in their entirety, and giving the State the benefit of all proper inferences therefrom, from which a conclusion of guilt could properly be drawn." *State v. Smith*, 32 *N. J.* 501, 521 (1960).

The State contends the proof that (1) "defendant was in the apartment alone at the time S–1 was found"; (2) Lieutenant Saunders testified that he "resided" there; (3) "he [defendant] admitted he paid the telephone bill for the telephone next to which S–1 was found"; and (4) defendant presented no evidence in his own behalf, circumstantially established a *prima facie* case of guilt. The last mentioned circumstance obviously has no bearing on the issues before us, since we are here concerned only with the sufficiency of the proof before the trial court, at the time the motion for acquittal was made.

■ If it could be inferred from the proof that the apartment was a place over which defendant exercised, or had a right to exercise, dominion, and that he "resided" there in the permanent sense which "residence" ordinarily implies, an inference might be drawn that the defendant was familiar with the contents of his castle and intended to appropriate them to his exclusive use. But the facts do not justify a rational inference to this effect. According to the State's proof, the registered tenant of the apartment was DeLuca, the telephone was in his name, and no evidence whatever was offered tending to establish any connection between DeLuca and the defendant, or that DeLuca was either a fictional being, or a "front" for defendant. Furthermore, Myrtle Klein had free access to the apartment and performed household duties therein which are ordinarily significant of permanent residence. Thus, it is no more reasonable to infer that defendant exercised the necessary dominion over the premises than that she did. And Lieutenant Saunders' cryptic and unexplained statement that the apartment was the residence of defendant and Myrtle Klein, is no more susceptible of the inference that he knew this to be the fact, than that he merely concluded this was so because both persons were in the apartment while he was there.

It cannot be gainsaid that defendant's admission that he paid the telephone bill for the telephone in the apartment

can be said to impute some interest in the apartment or its occupants, beyond that of a casual visitor. But to determine what that interest was in light of the circumstances proven, would require indulgence in sheer speculation. In all probability similar favors are granted gratuitously, by one to another, for a myriad of reasons dissociated from lottery operations, and a conclusion that the payment of the telephone bill could be inferentially indicative of defendant's knowing possession of the paper in question would be purely conjectural.

Applying the test laid down in *State v. Smith, supra,* we are of the firm belief that the complex of the State's proofs, however viewed, failed to permit of the inference that defendant knowingly was in possession of "a paper" contemplated by *N. J. S.* 2A:121–3(b), *supra.*

Reversed. Judgment of acquittal to be entered.